## ALBRIGHT v. GEYER et al.
### No. 9079.

Circuit Court of Appeals, Fifth Circuit.

Dec. 29, 1939.

H. B. Thomas, Jr., of Dallas, Tex., for appellant.

R. G. Storey, of Dallas, Tex., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellant, as residuary legatee of one Seago, sued on contracts he had made with defendants in connection with the solicitation and securing of hospitalization members. Defendants, moving to dismiss the suit on various grounds, prevailed on the general theory that the rights Seago had, under his various contracts, were of indefinite duration, and were terminated at and by his death. Appellant is here insisting that the rights she asserts in this suit to the benefits of Seago's contracts, passed to her on his death, and that the judgment gives his death an effect upon those rights which is not only not provided for in, but is contrary to a just and reasonable construction of, the contracts from which those rights flow. We think appellant is right,

and that a setting out of the contents of the contracts, in summary as to all but the royalty contract, and in full as to that, will plainly show that this is so.

First, in the series of contracts is one between the National Hospitalization System, Inc., and the Dallas Methodist Hospital, dated December 3, 1931, to run for five years, with a renewal option for five years more. In this, "the system" agrees to secure a minimum of 2,000, a maximum of 10,000 "hospitalization plan members," within one year from date at a price per member of $9 per year, payable monthly at $.75 per month per member, or quarterly or semi-annually on the yearly rate. For its services "the system" was to receive 33⅓% of all moneys collected from members and on all renewals thereafter.

The second is a contract between the same parties, dated December 3, 1933, superseding the one of December 3, 1931, by the terms of which "the system" agrees to continue to secure memberships at the same price per member and agrees to maintain a minimum of 4,000 paid up members. For commissions, "the system" is to have on individual memberships, $.25 per month on group memberships, $.25 for each of the first two members covered by the group certificate, and no fee for the others. There was a provision for forfeiture for failure of "the system" to comply with its agreements and a provision that the contract should expire on October 28, 1937, with an option to "the system" to renew it for an additional five years, "upon the same terms, except that the amount of the membership fees with charges to be made by the hospital and the per cent to be retained by 'the system' for its services are to be agreed upon by the parties at the time of entering into the renewal contract."

The third is a contract dated October 28, 1932, with St. Paul's Hospital, Dallas, Texas, to run for a period of five years, with an option of renewal on substantially the same terms and compensation as contained in the contracts with the Dallas Methodist Hospital.

The fourth is a contract dated March 2, 1931, between the system and Seago. This contract reciting the hospitalization plan efforts in which the system was engaged, made Seago the sole and exclusive agent of "the system" "for the purpose of carrying on and continuing and controlling the business of the company in Dallas including the Dallas Methodist Hos-

pital of Dallas and all other hospitals located in Dallas County which may be contracted with, by the company during the term of this contract, the contract to run for five years from December, 1930, and for such other and additional time as the company's contract with any hospital in Dallas County, may continue in force." It was agreed that Seago should have a commission of $2.25 of the annual membership dues of each member for the first year, and of $2 of the annual renewal memberships, all moneys were to be received by the system and it was to report to and settle with Seago. Sections 6 and 7 of the contract are as follows:

Six—"In case of the cancellation or termination of this contract for any reason, the commissions due or to become due on business already secured under this contract shall continue to be due and payable to said Seago as per paragraphs 3 and 4 hereof, and paragraph 5 hereof relative to the collection of delinquent dues by Seago, and such commissions shall not be effected by such cancellation or termination."

Seven—"In view of the financial investments heretofore made in the Company, and the further financial investment which will be made by said Seago in establishing the Company's business in Dallas County, Texas, it is specially agreed that in the event the Company fails to continue its business and to carry out and perform its agreements under this contract with the said Seago, then in that event it is now agreed that this contract shall be a full sale, assignment and delivery of the Company's business and all contracts with hospitals and members in Dallas County, Texas, to said Seago, his heirs, and assigns, and he shall be entitled to hold, own, continue and enjoy, all the income, benefits and advantages thereof."

Fifth, an amended contract dated January 3, 1933, between "the system" and Seago, giving Seago an additional $.50 per member for the life of the Dallas agency contract, or any renewal or extension of it.

Sixth is the royalty contract between Seago and Wheeler dated January 14, 1933, and providing as follows:

"Whereas, on the second day of March, 1931, the National Hospitalization System, Inc., as party of the first part, entered into an Agency contract covering what was therein termed as the Dallas Agency of the National Hospitalization System, Inc., with W. H. Seago of Dallas, Texas, as party of the second part, to which reference is hereby made for full particulars, and including thereto and thereof, and

"Whereas, for a valuable consideration, said W. H. Seago desires to assign, transfer and deliver the management, rights and privileges of said Dallas Agency, and said contract hereinbefore described, to C. M. Wheeler for the life of said Dallas Agency contract or any supplement, amendment or extension thereof, subject to the provisions herein contained;

"Now, Therefore, the complete control, management and supervision of the said Dallas Agency of the National Hospitalization System, Inc., provided for under said Agency contract referred to hereinbefore, is hereby transferred and assigned to C. M. Wheeler of Dallas, Texas, for the life of such Agency contract, including all supplements and amendments thereto or extensions thereof, and for and in consideration thereof the said C. M. Wheeler does hereby agree to pay to the said W. H. Seago, a royalty equal to two and one-half cents (.02½) per member per month on the total number of members of said Dallas Agency in force of record on the first day of each month; such royalty payments to begin January 1, 1933, and continue throughout the life of this agreement, and same shall be payable by the said C. M. Wheeler depositing to the credit of the said W. H. Seago in the Republic National Bank & Trust Company of Dallas, Texas, not less than Twenty-five ($25.00) Dollars per week on the 7th, 14th, 21st, and 1st days of each month throughout this agreement and to further render statement of any excess over and above said $25.00 per week, and such excess of such royalties due hereunder shall be paid to the said W. H. Seago on the first day of each month throughout the term of this contract; such $25.00 minimum guarantee per week royalties to be paid hereunder being expressly acknowledged and agreed to by the said C. M. Wheeler; that in the event the said C. M. Wheeler defaults in the payment of the sums and royalties provided for herein for a period of three (3) days at any one time, the said W. H. Seago is hereby granted the right, authority and privilege, rights and privileges under said Dallas Agency contract, and said Dallas Agency contract shall thereupon automatically revert to the said W. H. Seago, together with all properties of every character and description belonging to the said Dallas Agency.

"It is further agreed by and between the parties hereto that the said W. H. Seago shall have access to, at all reasonable times, any and all of the books and records of the said Dallas Agency in any wise pertaining to the business of the said Agency, and to examine the same and to obtain therefrom any information recorded therein, or to appoint a duly authorized agent for such purposes."

The seventh is the contract of the same date between Seago and Wheeler reciting that Wheeler has transferred to Adolph Geyer his interest in the National Hospitalization System, and his interest in the contract between Wheeler and Seago of even date, and that Seago agrees to the transfer and reduces his royalty from 2½ to $.2 per member per month when there are as many as 9,000 members in force, all other terms of the contract between Wheeler and Seago to remain in full force and effect.

Supplementing the showing of the contracts, plaintiff alleged that the contracts with the Dallas Hospitals were fully and completely performed and continued in full force and effect up to the date of their expiration on October 31, 1937; that before their expiration and as provided for in them, "the system" secured renewal contracts with both of the hospitals for an additional period of five years; that on October 28, 1937, when the primary terms of the contracts expired there were about 12,000 plan members; that these members were carried forward and the commission paid on them under the new contract with no further change except that the compensation was reduced from $.25 per month per member to $.21 per month per member; that until Seago's death on June 24, 1936, defendant continued to pay him the royalties provided for in the contract of January 24, 1933; that from and after his death they have failed to do so; and that there is due plaintiff as royalty under the terms of the said contract, up to October 28, 1937, when the primary terms of the contracts expired, $3520, with a further sum of $3300 as royalty on members, continued in force and retained under the contracts as renewed in 1937.

There was a prayer in the alternative that if Seago's contract of January 14, 1933, be considered as terminated by his death, then, by its terms the properties belonging to the Dallas Agency under the contract of March 2, 1931, reverted to Seago, and plaintiff is entitled to recover, under the contract, $2.25 per member on all of the memberships in force. Finally, there is a prayer that, if it be considered that Seago's death both ended the contract for royalty and terminated his agency contract of March 2, 1931, then, under Clause 6 of that contract, she was entitled to $2 per year of the annual renewal membership dues of each member, whose membership was in force at Seago's death.

Appellant, insisting that appellee's case upon the royalty contract must fail because of the indefiniteness of that contract, since it fixes no term for its continuance, and its case, upon the agency contract, must fail because that contract was in its nature personal, and Seago's death prevented its being performed, urges upon us that the judgment was right.

We do not think so. As to the supposed indefiniteness of the royalty contract, we think it quite plain that the contract must be read in the light of the agency contract which it transfers and assigns to Wheeler, and that so read it must be read as providing that, the royalty payments are to begin on January 1, 1933, and to continue throughout the life of the agency agreement which as matters stood when these contracts were made, was, until October 28, 1937. So read, there is nothing in it of indefiniteness or uncertainty. So read, it obligates Wheeler and his assigns to continue paying royalties throughout the term of the Dallas Agency contract which Seago had assigned to Wheeler, and Wheeler to Geyer, and there can be no question, we think, of plaintiff's right to recover the royalties up to October 28, 1937. We do not think though that the royalty contract was extended beyond that time so as to entitle plaintiff to royalties under the renewal contracts. The only provision in Seago's system contract for its duration is paragraph 1. This provides that the contract "shall be, and remain in full force and effect for a period of five years from its date, and for such other and additional time as the Company's contracts with any hospital in Dallas County, Texas, may continue in force." When the royalty contract was written in January, 1933, there were in force two contracts; one with St. Paul's, dated October, 1932, and the superseding contract with the Methodist Hospital, dated December, 1933. Both of these contracts were to expire October 28, 1937. It is quite plain, we think, that

Seago's contracts, both the original agency contract and the one for royalty, ran concurrently with these contracts, and that he was entitled to royalties under them until their expiration.

We think it is equally plain that his royalty contract did not embrace their renewal. In the first place, nothing is said in Seago's royalty contract about the renewal of either that contract or the contracts on which it rests. In the second place, the option for renewal of the hospital contracts provides that there must be a new agreement made as to membership fees, and their division between hospitals and "system." If the option had provided for a renewal of the contracts on the same terms, it might reasonably be contended that, the provision in Seago's Agency contract—that it should continue "for such additional time as the 'System's' contracts with any hospital in Dallas County may continue in force"—might well be construed as applying to the renewal of these contracts, under the option, as a continuing of those contracts in force. But with the provision for the option as it is, with its requirement for a new agreement as to compensation, we do not think it would be reasonable to say of the renewal contracts that they were the original contracts continued in force within the meaning of Seago's contract.

For the error in dismissing plaintiff's petition, the judgment is reversed, and the cause is remanded for further and not inconsistent proceedings.

Reversed and remanded.